SHIVERS, Senior Judge.
Following a trial by jury, Russell Dean Rigdon was found guilty of 11 counts of attempted second degree murder while possessing a firearm. In this appeal, Rigdon asserts that the trial court erred in refusing to allow the defense’s expert psychiatrist, Dr. Miller, to testify regarding the effects of Rigdon’s intoxication. For the reasons stated in this opinion, we affirm the trial court’s order refusing to allow Dr. Miller to testify.
The facts of this case are undisputed and are briefly described as follows. At 6:00 p.m. one evening, 11 construction workers were traveling home on Interstate 10 from a job in Jacksonville. All of the men rode in the same pick-up truck, and five men were in the bed of the truck, which was covered by a topper. At some point, Rigdon, who was in his ear with a friend, drove up very close behind the pick-up truck, as if he was going to ram the truck. The men in the truck motioned for the driver of the car to come around the truck or back off. Other than the testimony of one defense witness (who was not present during the incident), all the testimony indicates that the men did nothing to threaten Rigdon. As he was driving behind the truck, Rigdon pulled out a gun and shot at the median. In response, one of the men in the truck grabbed a large water cooler and motioned as if he would throw it at Rigdon’s car. When Rigdon’s car got close to the truck again, Rigdon began to wave his gun into the air, and he started shooting into the back of the truck. As he was shooting, he *1129 drove off the interstate and onto an exit ramp, all the while pointing the gun at the truck, pulling the trigger (although at this point, no bullets came out), and laughing. Two of the men in the back of the truck were wounded.
Rigdon and his friend had been drinking since early that morning, consuming approximately three pitchers of beer and a few single beers. Rigdon’s friend did not believe that Rigdon was drunk, and the officer who arrested Rigdon shortly after the incident stated that Rigdon did not appear intoxicated. Rigdon’s girlfriend, however, testified that he sounded “drunk” on the phone when he called her during the day of the shooting.
The defense sought to have an expert psychiatrist, Dr. Miller, testify regarding Rigdon’s alcohol consumption and the effects that his asserted intoxication had on him during the crime. Defense counsel asserted that Dr. Miller’s testimony would help to establish the defense’s claim of self-defense. At the proffer, when asked whether he could form an opinion as to whether ingestion of alcohol had any effect on the way that Rigdon acted, Dr. Miller testified that “the alcohol disinhibited him, that is, caused him to enter more easily a state of loss of control or discontrol than ordinarily would have been the ease.” Additionally, the following testimony took place:
[DEFENSE COUNSEL]: In this case, based upon what you know about his recitation of the facts and mine to you and I think reviewing the arrest and booking report, basically because he was intoxicated he could have felt that he was being attacked and was defending himself by his actions that night?
[DR. MILLER]: He could have felt any number of things including that misperception that he was himself being attacked. This young man has had a severe character disorder, even when he is sober he’s unstable. I noticed in reviewing the jail infirmary records that he was involved in two altercations, one with a correctional officer and that of course is most unadvisa-ble. He’s given to impulses, he cannot restrain himself from acting out and aleo-hol would have even greater effect in this regard, that is disinhibiting him.
Q: All right. So on this particular day in question, September 11th the alcohol greatly accelerated any discontrol he may have had anyway?
A: Very much so.
When asked by counsel for the state whether he was testifying that Rigdon had “diminished capacity,” Dr. Miller stated “Well, he had diminished capacity to control his impulses, I’m not saying that it necessarily applies as the formula.... I think that’s more in the legal frame work than in medical, I don’t think I can make a judgment in that regard.” This line of questioning continued:
[COUNSEL FOR THE STATE]: Okay, So what we’re saying basically is his alcohol or at least his statements that he was intoxicated in some way clouded his perception of what happened out there?
[DR. MILLER]: Yes.
Q: Okay. Wouldn’t you label that diminished capacity?
A: I stumble on that word because it has legal implications, those are — those aren’t harmless semantics. I think it diminished his ability to perceive accurately and to respond logically to certain situations particularly where emotionally in tune.
When questioned by the court as to how he would describe Rigdon’s condition at the time of the shooting, Dr. Miller testified:
The medical standpoint, Your Honor, I think the correct terminology would be that he was in a state of diseontrol, I think that would be the more apt word.... And if he had two pitchers of beer and Tequila this would be effectively a chemical partial lobotomy, the same effect on the brain to remove that portion of conscience which normally functions. In fact, that’s one of the reasons a lot of people drink so they can do things that which would normally be against their conscience....
The trial judge refused to allow Dr. Miller to testify, ruling that the defense of “diminished capacity,” short of “insanity,” is not available as a defense to this crime and that the defense of “voluntary intoxication” is not *1130 available as a defense to second degree murder.
Rigdon argues that Dr. Miller’s testimony was not being offered as evidence to support a defense of “diminished capacity,” which Rigdon agreed would not be permissible; rather, Rigdon argues that the trial court should have allowed Dr. Miller to testify because his testimony would have bolstered Rigdon’s claim of self-defense. Rigdon also argues that the rationale behind allowing self-defense evidence in the “battered woman syndrome” line of cases is applicable in this case and that Dr. Miller’s testimony was comparable to properly admitted psychiatric testimony in the “battered women’s syndrome” cases.
We reject Appellant’s arguments and affirm the trial court’s decision for several reasons. First, it is within the trial court’s discretion to admit or exclude evidence, State v. Wright, 473 So.2d 268 (Fla. 1st DCA 1985), rev. denied, 484 So.2d 10 (Fla.1986), and Rigdon has failed to demonstrate that the trial court abused its discretion. Although Dr. Miller’s testimony was offered to advance a claim of self-defense, a review of the proffered testimony indicates that it was not relevant to the issue of self-defense. When specifically asked by defense counsel whether Rigdon “could have felt that he was being attacked and was defending himself,” Dr. Miller responded by saying that Rigdon “could have felt any number of things,” including the misperception that he was being attacked. Dr. Miller’s testimony only established that he felt that Rigdon was in a state of “discontrol,” not that Rigdon was in fact acting in self-defense when he shot the victims. Dr. Miller testified that Rigdon, like many people, experienced “disinhibiting” effects from alcohol he ingested and that alcohol would enhance his “inability to restrain himself from acting out” on his impulses. Thus, Dr. Miller’s testimony indicated only that because of Rigdon’s state of “discontrol,” Rigdon might have felt threatened or Rig-don’s actions could have been one possible response to his alcohol ingestion. However, even if Dr. Miller’s testimony was marginally relevant on the issue of self-defense, his testimony, at most, was speculative and confusing. Thus, his testimony could have properly been excluded under section 90.403, Florida Statutes, as being confusing or misleading.
AFFIRMED.
WOLF and LAWRENCE, JJ., concur.